Owen H. Smith (to be admitted PHV)
Matthew A. Bills (to be admitted PHV)
Zoe Cross (to be admitted PHV)
**BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP**
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Telephone: 312-984-3100

Gregory D. Miller
Timothy P. Gonzalez
**RIVKIN RADLER LLP**
25 Main Street
Court Plaza North, Suite 501
Hackensack, NJ 07601-7082
Telephone: 201-287-2460

Michael W. McConnell (to be admitted PHV)
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 94304
Telephone: 650-493-9300

Steffen N. Johnson (to be admitted PHV)
**WILSON SONSINI GOODRICH & ROSATI**
1700 K Street, N.W.
Washington, DC 20006
Telephone: 202-973-8800

*Attorneys for Plaintiffs Ford Motor Company, FCA US LLC, American Honda Motor Co., Inc. and Volkswagen Group of America, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FORD MOTOR COMPANY; FCA US LLC; AMERICAN HONDA MOTOR CO., INC.; and VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER DAVENPORT, solely in her official capacity as Attorney General of the State of New Jersey; and NEW JERSEY COALITION OF AUTOMOTIVE RETAILERS, INC., individually and in its representative capacity on behalf of its constituent members,<br><br>Defendants. | Civil Action No. ____________ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Ford Motor Company; FCA US LLC; American Honda Motor Co., Inc.; and Volkswagen Group of America, Inc. (collectively, the "Manufacturers" or "Plaintiffs"), by and through their undersigned counsel, bring this action against the above-named Defendants and allege as follows:

**LOCAL RULE 10.1(a) STATEMENT**

1. Plaintiff Ford Motor Company maintains its principal place of business at One American Road, Dearborn, Michigan 48126. Plaintiff FCA US LLC maintains its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. Plaintiff American Honda Motor Co., Inc. maintains its principal place of business at 1919 Torrance Boulevard, Torrance, California 90501. Plaintiff Volkswagen Group of America, Inc. maintains its principal place of business at 1950 Opportunity Way, Suite 1500, Reston, Virginia 20190. Defendant Jennifer Davenport is the Attorney General of the State of New Jersey and is sued solely in her official capacity; her office is located at the Richard J. Hughes Justice Complex, 25 Market Street, P.O. Box 080, Trenton, New Jersey 08625-0080. Defendant New Jersey Coalition of Automotive Retailers, Inc. maintains its principal place of business at 856 River Road, Trenton, New Jersey 08628.

**NATURE OF THE ACTION**

2. In adopting the New Jersey Motor Vehicle Open Recall Notice and Fair Compensation Act, P.L. 2025, c. 140 (the "Act"), which took effect on April 1, 2026, the New Jersey legislature bestowed on franchised New Jersey car dealers the unilateral, unchecked power to set the prices that manufacturers must pay them for

warranty, recall, and every other kind of non-retail service work, while prohibiting manufacturers from avoiding the extortionate results or otherwise recovering the costs.

3. These changes break faith with a half-century of New Jersey law. Since 1977, New Jersey limited dealer compensation for warranty labor and parts to "prevailing retail price[s]"—defined as prices that were "not unreasonable when compared with" those of comparable dealers in the same area. Binding, arm's-length contractual agreements between manufacturers and dealers likewise limited dealer compensation to reasonable rates. The new regime, by contrast, upends those agreements and openly incentivizes dealers to hike prices with "labor multipliers," requires payments for parts the manufacturers provide for free, and grants dealers the ability to "declare" binding labor rates and parts markups derived from small samples of repair orders that the dealers cherry-pick and the manufacturers must accept. Every dollar that a dealer adds to a retail customer's bill, and every fraction of an hour that the dealer bills a retail customer beyond the time that a repair actually requires, is replicated and multiplied across the dealer's entire manufacturer-paid service business. Gone is the reasonableness limitation that, for 50 years, anchored the system by allowing manufacturers to test dealer prices against market rates.

4. Manufacturers are also now forbidden from attempting to recover these increased costs through higher prices or surcharges. Further, through barriers built into New Jersey franchise law, manufacturers may not shift the work to competing

service providers or otherwise avoid the forced payments, whether by terminating warranty services in New Jersey or leaving the State altogether. In short, the Act rewards dealers for charging their customers more, and then uses those overcharges as the legally mandatory benchmark for manufacturer payments. No prior New Jersey law has gone anywhere near this far.

5. The Act arrives at the worst possible moment for New Jersey consumers. The cost of maintaining and repairing a vehicle has climbed more than 60 percent since 2019—among the fastest sustained price increases of any consumer category, far exceeding the rate of inflation. With the average price of a new vehicle now exceeding $50,000, vehicle ownership, including the costs of after-sales service, maintenance, upkeep, and repair, is becoming unaffordable for ordinary households.

6. And although the Act enriches dealers at the price of higher costs for both manufacturers and consumers, dealers have no legitimate need for legislative favor. The dealers collecting under the Act include some of the largest and most profitable retailers in the United States: national, publicly traded dealership groups and multi-billion-dollar private enterprises. For most dealers, service and parts operations are the most profitable part of their business, and dealership profits are near record levels.

7. The Manufacturers thus bring this action to challenge the provisions of New Jersey law that create this scheme: Section 7 of the Act, which amended the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq*. (the "NJFPA"), and is codified in extensive amendments to N.J.S.A. 56:10-15. *See* Exhibit 1. The Manufacturers

seek a declaration that these provisions are unconstitutional on their face—individually, in the aggregate, and as an integrated and non-severable scheme—and an injunction against their enforcement.

8. Specifically, in place of the now-abandoned reasonableness standard, the Act hands New Jersey dealers a blank check in three categories of service costs (collectively, the "**Compensation Provisions**"):

a. The first is the "**Dealer-Declared Rate Provisions**," N.J.S.A. 56:10-15(d), (l), (m), which permit each dealer to "declare[]" its own labor rate, "labor multiplier," and parts markup, each derived from a sample of 100 cherry-picked repair orders, with no reasonableness check. Dealers can submit separate samples for their labor rate, labor multiplier, and parts markup, maximizing their declared compensation for each. Among these Dealer-Declared Rate Provisions, the most aggressive and unprecedented is the "**Labor Multiplier**," N.J.S.A. 56:10-15(m), which allows each dealer to impose its own "multiplier" on manufacturers' time allowances for individual labor operations, thus compelling manufacturers to pay dealers for substantially more labor time than they actually work.

b. The second is the "**Reduced-Cost Parts Markup**," N.J.S.A. 56:10-15(e), which compels manufacturers to pay dealers a marked-up "wholesale value" charge on parts that the manufacturers have already supplied to dealers at no or reduced cost.

c. The third is the "**Parts-Pricing Restriction**," N.J.S.A. 56:10-15(q), which prohibits manufacturers from reducing the price of parts used in

manufacturer-paid repairs if the effect would be to lower the compensation paid to dealers, even if supply, demand, or other market factors would warrant a price cut.

9. The Act then places the dealers' self-declared compensation beyond review or recovery. The "**Audit Limitation**," N.J.S.A. 56:10-15(a), (d), (l), (m), confines any manufacturer audit "only" to a dealer's own cherry-picked sample. With the reasonableness proviso deleted, this eliminates the one comparison that formerly reached beyond, and served as a check on, that sample.

10. The "**Cost-Recovery Prohibition**," N.J.S.A. 56:10-15(o), forbids manufacturers from recovering the Act's costs from New Jersey dealers through any mechanism, "including, but not limited to," wholesale price increases and surcharges—prohibiting manufacturers from exercising their contractual rights to recoup the substantial costs of the Act from New Jersey dealers.

11. The Compensation Provisions, the Audit Limitation, and the Cost-Recovery Prohibition, together with the amendments to N.J.S.A. 56:10-15 that implement them, are collectively the "**Challenged Provisions**."

12. Together with other NJFPA provisions, the Challenged Provisions create a closed extraction system from which manufacturers have no lawful escape. As alleged below, manufacturers subject to the Act cannot refuse to pay, cannot restrict dealers' work, cannot perform the work themselves, cannot audit beyond the dealers' own samples, cannot recover their costs, cannot adjust their own parts prices, and cannot leave the State without being penalized enormously for exercising that

right. Every valve is welded shut, and every mechanism in the system moves prices in only one direction: up.

13. The consequences are quickly unfolding. In the months since the Act took effect, dealers throughout New Jersey have declared—and demanded payment at—labor rates and multipliers that compel manufacturers to pay for hours that no technician works, that surpass what comparable dealers charge for the same work, and that exceed what retail customers pay. Each Plaintiff has received dozens of submissions from its New Jersey dealers for increased compensation under the Act.

14. On information and belief, the Act will shift more than $375 million per year from manufacturers to New Jersey dealers. And dealers are free to pocket this windfall in full: the Act contains no enforceable requirement that any of it be used to reduce costs, improve services for consumers, or increase compensation for workers.

15. The Act's burdens are retroactive, upend existing contracts, and are not confined to transactions occurring in New Jersey. The Act applies to every vehicle serviced by dealers in New Jersey, including the millions already on the road whose warranties were priced and sold in New Jersey and in other States before the Act existed, in transactions that the Manufacturers cannot reopen or adjust. And because the Cost-Recovery Prohibition forecloses recovery of the Act's costs, the Act ensures, by statutory design, that its burdens come to rest on the Manufacturers, none of which may recoup them from any New Jersey dealer.

16. The Challenged Provisions violate the U.S. Constitution in multiple independent ways. *First*, they substantially impair the Manufacturers' existing

dealer agreements through an unprecedented combination of terms that no party agreed to or would ever accept, in violation of the Contracts Clause. *Second*, they take the Manufacturers' property—specific, identifiable, and calculable sums of money—without just compensation, in violation of the Takings Clause. *Third*, they discriminate against and unduly burden interstate commerce, in violation of the Commerce Clause. *Fourth*, they deprive the Manufacturers of property on the arbitrary and irrational basis of pure economic protectionism of New Jersey dealers, in violation of the Due Process Clause of the Fourteenth Amendment, as well as Article I, Paragraph 1 of the New Jersey Constitution. And *fifth*, the Act's recall-specific provisions are preempted by the federal recall regime established by the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.*, under the Supremacy Clause.

17. Because the Challenged Provisions were enacted as a single, interdependent compensation scheme—each provision reinforcing the others, and none capable of operating as the legislature intended without the rest—they are non-severable and must fall together. Upon their invalidation, the prior law of New Jersey, including its retail-rate compensation standard and reasonableness safeguard, will continue to govern, as the unconstitutional amendment is a nullity that never displaced the statute it purported to amend.

18. The Manufacturers accordingly seek a declaration that Section 7 of the Act is unconstitutional, invalid, and unenforceable; an injunction against its enforcement by either Defendant; and a declaration that the payments that each

Manufacturer has made under the Challenged Provisions were made under compulsion of law and under reservation of rights and effect no waiver of its right to recover them.

## THE PARTIES

19. Plaintiff Ford Motor Company ("Ford") is a Delaware corporation with its principal place of business in Dearborn, Michigan. For purposes of 28 U.S.C. § 1332, Ford is a citizen of Delaware and Michigan. Ford distributes Ford- and Lincoln-brand new motor vehicles, parts, and accessories throughout the United States, including through independent, authorized New Jersey Ford and Lincoln dealers.

20. Plaintiff FCA US LLC ("FCA US") is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA US's sole member is FCA North America Holdings LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in Auburn Hills, Michigan. FCA North America Holdings LLC has one member, FCA Foreign Sales Holdco Ltd., which is a company organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. FCA Foreign Sales Holdco Ltd. is wholly owned by SFS UK 1 Limited, which is also a company organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. SFS UK 1 Limited is wholly owned by Stellantis N.V. (formerly Fiat Chrysler Automobiles N.V.), which is a publicly traded company organized under the laws of the Netherlands, with its principal place of business in the Netherlands. Because FCA US's citizenship is determined by the citizenship of

its members and FCA Foreign Sales Holdco Ltd. is a citizen of the United Kingdom, FCA US is a citizen of the United Kingdom for the purposes of 28 U.S.C. § 1332. FCA US distributes Chrysler-, Dodge-, Jeep-, Ram-, Fiat-, and Alfa Romeo-brand new motor vehicles, parts, and accessories throughout the United States, including through independent, authorized New Jersey dealers.

21. Plaintiff American Honda Motor Co., Inc. ("Honda") is a California corporation with its principal place of business in Torrance, California. For purposes of 28 U.S.C. § 1332, Honda is a citizen of California. Honda distributes Honda- and Acura-brand new motor vehicles, parts, and accessories throughout the United States, including through independent, authorized New Jersey Honda and Acura dealers.

22. Plaintiff Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation with its principal place of business in Reston, Virginia. VWGoA distributes Volkswagen- and Audi-brand new motor vehicles, parts, and accessories throughout the United States, including through independent, authorized New Jersey Volkswagen and Audi dealers.

23. Defendant Jennifer Davenport is named as a defendant solely in her official capacity as the Attorney General of the State of New Jersey (the "Attorney General"). The Attorney General is the State's chief law enforcement officer, is charged by law with enforcement authority that extends to violations of the NJFPA, and, on information and belief, maintains that the Challenged Provisions are valid and enforceable and intends to enforce and defend them.

24. Defendant New Jersey Coalition of Automotive Retailers, Inc. ("NJ CAR") is a New Jersey nonprofit corporation with its principal place of business in Trenton, New Jersey, and is a citizen of New Jersey for purposes of 28 U.S.C. § 1332. NJ CAR is the statewide trade association of New Jersey's franchised new motor vehicle dealers, with a membership comprising more than 500 franchised dealers. NJ CAR is governed and directed by dealers through its Executive Committee and Board of Trustees, and its chairman is himself a dealer principal. NJ CAR is named as a Defendant in its individual capacity and in its representative capacity on behalf of its constituent dealer members.

25. N.J.S.A. 56:10-34, enacted as Section 3 of the Act, grants NJ CAR standing to bring an action in any court of competent jurisdiction, "for itself or by, for, or on behalf of any motor vehicle franchisee or group of motor vehicle franchisees" for any violation of the NJFPA, including violations of the Challenged Provisions. The legislature conferred that standing to override the New Jersey Supreme Court's holding that NJ CAR lacked it. *See N.J. Coal. of Auto. Retailers, Inc. v. Ford Motor Co.*, 261 N.J. 348 (2025). NJ CAR has confirmed its enforcement role, stating that the Act "explicitly grant[s] NJ CAR and similar associations standing to bring legal action against violations, strengthening enforcement and accountability." The Act thereby designates NJ CAR as an authorized enforcer of the very provisions challenged in this action.

26. NJ CAR procured the Act through what its own leadership later described as a "major investment in a public relations campaign." NJ CAR assured

the legislature that the bill would guarantee dealers "the same retail price a consumer pays" and "labor times that mirror what the retail customer pays for similar repairs." Those assurances were inconsistent with the actual bill: retail-rate compensation was already the law of New Jersey, and the Act *repealed* the standard that made it so, replacing it with dealer-declared formulas that bear no necessary relationship to what any retail customer pays.

27. NJ CAR has a long history of litigation against manufacturers on its members' behalf, including litigation concerning warranty reimbursement and manufacturer incentive programs. Since the Act took effect, NJ CAR has, on information and belief, assisted its dealer members in preparing and submitting rate declarations under the Challenged Provisions, including through vendors that NJ CAR sponsors and recommends for that purpose.

28. NJ CAR has also acted to enforce the Challenged Provisions on behalf of New Jersey dealers. In October 2026, NJ CAR wrote to one Manufacturer to contest its responses to labor-rate, labor-multiplier, and parts-markup declarations submitted by its New Jersey dealers, demanding that the Manufacturer comply with the Challenged Provisions and expressly reserving NJ CAR's right to bring an enforcement action under N.J.S.A. 56:10-34. NJ CAR thus regards itself as authorized to enforce the Challenged Provisions and has signaled its intent to do so.

29. NJ CAR, as the statutorily designated representative and enforcer of New Jersey's franchised dealers with respect to the NJFPA, adequately represents the interests of its dealer members in this action.

## JURISDICTION AND VENUE

30. This action arises under the Contracts Clause, the Takings Clause, the Commerce Clause, the Due Process Clause, and the Supremacy Clause of, and the Fifth and Fourteenth Amendments to, the United States Constitution; under Article I, Paragraph 1 of the New Jersey Constitution; under 42 U.S.C. §§ 1983 and 1988; under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and under this Court's traditional equitable authority to enjoin the enforcement of state statutes that violate the Constitution or are preempted by federal law. *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).

31. This Court has subject matter jurisdiction over the Manufacturers' claims against the Attorney General pursuant to 28 U.S.C. §§ 1331 and 1343 because those claims arise under the Constitution and laws of the United States and are brought, under *Ex parte Young*, 42 U.S.C. § 1983, and this Court's equitable authority, to enjoin a state officer's enforcement of unconstitutional and federally preempted state statutory provisions.

32. The Attorney General has authority to enforce the Challenged Provisions. She is charged with enforcing the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* (the "NJCFA"), including through the investigative and enforcement powers conferred by N.J.S.A. 56:8-3, 56:8-4, 56:8-8, and 56:8-13. Under N.J.S.A. 56:8-2 and 56:8-4(b) (as amended by P.L. 2022, c. 96, § 2), the Attorney General's enforcement authority under the NJCFA extends to violations of the NJFPA, including the provisions added and amended by the Act. On information and belief, the Attorney General construes her authority to reach violations of the NJFPA

by motor vehicle franchisors, has not disclaimed enforcement of the Challenged Provisions, and will defend their validity in this action. There is accordingly a credible threat that the Attorney General will enforce the Challenged Provisions against the Manufacturers.

33. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 over each Manufacturer's claim in Count VI against the Attorney General and NJ CAR, which arises under federal law. Count VI invokes this Court's traditional equitable authority to restrain state officials and parties that the legislature has statutorily authorized to enforce the NJFPA, *see* N.J.S.A. 56:10-34, from enforcing state statutory provisions that are preempted by the National Traffic and Motor Vehicle Safety Act and are therefore invalid under the Supremacy Clause.

34. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over each Manufacturer's claims against NJ CAR in Counts I through V because those claims are so related to the claims within this Court's original jurisdiction under 28 U.S.C. § 1331—including each Manufacturer's claims against the Attorney General and each Manufacturer's claim against NJ CAR in Count VI, all of which challenge the same statutory provisions on the same or similar grounds—that they form part of the same case or controversy under Article III of the United States Constitution. The limitations of 28 U.S.C. § 1367(b) do not apply, because this is not a civil action of which the district courts have original jurisdiction founded solely on 28 U.S.C. § 1332.

35. In addition, and in the alternative, this Court has diversity jurisdiction under 28 U.S.C. § 1332 over the claims brought by Ford, FCA US, and Honda against NJ CAR. Diversity of citizenship exists between Ford, FCA US, and Honda, on the one hand, and NJ CAR, on the other, including in the event the claims arising under this Court's federal-question jurisdiction were dismissed. Ford is a citizen of Delaware and Michigan; FCA US is a citizen of the United Kingdom; Honda is a citizen of California; and NJ CAR is a citizen of New Jersey. The amount in controversy individually for Ford, FCA US, and Honda exceeds $75,000, exclusive of interest and costs: the object of this litigation for each is relief from compensation obligations under the Challenged Provisions amounting to many millions of dollars annually. There is, therefore, federal subject matter jurisdiction over the claims of Ford, FCA US, and Honda against NJ CAR under 28 U.S.C. § 1332(a). Additionally, this Court would have supplemental pendent-party jurisdiction under 28 U.S.C. § 1367(a) over VWGoA's claims against NJ CAR because VWGoA's claims against NJ CAR are so related to VWGoA's claims against the Attorney General and Ford, FCA US, and Honda's claims against the Attorney General and NJ CAR that they form part of the same case or controversy under Article III of the U.S. Constitution. In that event, the limitations of 28 U.S.C. § 1367(b) would not apply because the Court's original jurisdiction would not be founded solely on 28 U.S.C. § 1332.

36. In the alternative, or in the event that the claims arising under this Court's federal-question jurisdiction were dismissed, Ford, FCA US, and Honda's claims against NJ CAR could proceed in this Court under 28 U.S.C. § 1332(a) without

VWGoA's claims because VWGoA is a dispensable party whose claims may be severed or dismissed under Federal Rule of Civil Procedure 21 to the extent necessary to perfect that jurisdiction.

37. An actual and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201. The Challenged Provisions took effect on April 1, 2026, and have been and are being applied to the Manufacturers, as alleged in Paragraphs 124 through 132 below. The Attorney General, on information and belief, contends that the Challenged Provisions are valid and enforceable. NJ CAR procured the Act, has statutory authority to enforce it, has publicly embraced that authority, has sent a written notice to at least one Manufacturer demanding compliance with the Challenged Provisions and reserving its right to bring an enforcement action, and, on information and belief, is assisting other dealers in extracting payments under the Act. A declaration of this Court will resolve that controversy or a substantial portion of it.

38. This Court is authorized to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and injunctive relief under Federal Rule of Civil Procedure 65, *Ex parte Young*, 42 U.S.C. § 1983, and its equitable authority. This Court is authorized to award attorneys' fees and costs against the Attorney General under 42 U.S.C. § 1988.

39. This Court has personal jurisdiction over the Attorney General, a New Jersey government official sued in her official capacity, and over NJ CAR, a New Jersey nonprofit corporation with its principal place of business in New Jersey.

40. Venue is proper in this District under 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

41. Counts I through IV are asserted by all Plaintiffs against the Attorney General under this Court's federal-question jurisdiction, and Counts I through V are asserted by all Plaintiffs against NJ CAR under this Court's supplemental jurisdiction, 28 U.S.C. § 1367(a), with diversity jurisdiction under 28 U.S.C. § 1332(a) available as an independent, alternative basis for the claims by Ford, FCA US, and Honda against NJ CAR and supplemental pendent-party jurisdiction under 28 U.S.C. § 1367(a) over VWGoA's claims against NJ CAR, as alleged above. Count VI is asserted by all Plaintiffs against both Defendants under this Court's federal-question jurisdiction.

## FACTUAL AND STATUTORY BACKGROUND

### I. For Nearly 50 Years, Manufacturers Paid Dealers Retail-Rate Warranty Compensation Subject to a Reasonableness Safeguard.

42. Manufacturers' relationships with their New Jersey dealers are governed by written dealer agreements. Each Manufacturer's dealer agreements, together with the policies and procedures those agreements incorporate, license its trademark to the dealers and, in return, require the dealers (among other things) to sell and service the Manufacturer's motor vehicles. Dealers' service obligations under the dealer agreements include providing warranty and recall service free of charge to consumers. Each Manufacturer is contractually obligated to reimburse its dealers for the warranty and recall work they perform.

43. Each Manufacturer's dealer agreements also reserve the Manufacturer's right to establish the methodology for determining warranty and recall compensation, which each Manufacturer does through published labor time guides that assign a standard time allowance to each defined repair operation and through a fixed formula for parts compensation. Where a time allowance proves insufficient for a justifiable reason, each Manufacturer permits the dealer to ask for additional compensation reflecting the actual time required to complete the repair, and each maintains a procedure by which a dealer may dispute the Manufacturer's time allowance as inadequate and seek to increase it. The dealer agreements and incorporated policies also reserve to each Manufacturer the right to approve each dealer's warranty labor rate under standards that the Manufacturer sets. Historically, warranty labor reimbursement has been the product of the dealer's approved labor rate and the Manufacturer's time-guide hours for the repair performed.

44. The NJFPA overlays the contractual relationship between motor vehicle franchisors and their franchised dealers. The NJFPA generally prohibits manufacturers from selling or servicing motor vehicles directly, instead requiring that sales and service be performed through franchised dealers. *See* N.J.S.A. 56:10-7.4(e), -27, -28. The NJFPA thus ensures that a Manufacturer's franchised dealers are the exclusive providers of warranty and recall service on their vehicles in this State.

45. Beginning in 1977, the NJFPA entitled every New Jersey dealer to warranty compensation at whatever retail rates prevailed in the market. Specifically, the statute required manufacturers to reimburse dealers "in an amount equal to the prevailing retail price charged by such motor vehicle franchisee for such services and parts in circumstances where such services are rendered or such parts supplied other than pursuant to warranty." Former N.J.S.A. 56:10-15(a) (amended eff. Apr. 1, 2026). If a manufacturer's reimbursement yielded less than retail, the statute entitled the dealer to claim its higher retail rate.

46. But the 1977 legislature paired that entitlement with an important safeguard: the dealer's claimed retail price governed only "provided that such motor vehicle franchisee's prevailing retail price is not unreasonable when compared with that of the holders of motor vehicle franchises from the same motor vehicle franchisor for identical merchandise or services in the geographic area in which the motor vehicle franchisee is engaged in business." *Id.* Retail-rate compensation and the reasonableness safeguard were two halves of a single bargain: dealers were made whole at retail, and manufacturers retained a check against outlier pricing.

47. The legislature preserved that bargain in every subsequent amendment to the NJFPA for nearly 50 years. Amendments in 1992, 1999, and 2011 extended the statute's reach—adding a parts-markup formula derived from 100 sequential customer-paid repair orders, payment deadlines, chargeback limitations, and audit rules—but every version retained the retail-price standard and its reasonableness proviso, and every version permitted the manufacturer to audit a dealer's submission

and adjust the resulting rate based not only on the soundness of the dealer's calculation but also on its comparison of the dealer's proposed rate with the rates of other same line-make dealers in the area. *See* P.L. 1991, c. 459; P.L. 1999, c. 45; P.L. 2011, c. 66.

48. New Jersey law likewise ensured that dealers were protected in the event of a safety recall. The NJFPA has long required manufacturers to compensate dealers for "all reasonable costs incurred by the franchisee in complying with the requirements imposed on the franchisee by the franchisor relating to a product recall." N.J.S.A. 56:10-7.4(c). Dealers accordingly received full compensation for recall work under the pre-Act regime, subject only to a reasonableness limitation.

49. New Jersey dealers prospered under that regime. Nothing in the Act's text or legislative history identifies any evidence that dealers were undercompensated for warranty or recall work under the prior law.

## II. Consumers Face Rapidly Rising Vehicle-Service Costs While Dealership Service Departments Drive Dealer Profits.

50. The cost of owning and maintaining a motor vehicle in the United States has risen dramatically in recent years. According to the Bureau of Labor Statistics, the consumer price index for motor vehicle maintenance and repair has increased by more than 60 percent since 2019—far outpacing overall inflation and ranking among the fastest sustained price increases of any category of consumer spending.

51. Vehicle prices have risen in tandem. The average transaction price of a new vehicle is now around $50,000. *See* Kelley Blue Book, Average Transaction Price Tables (Aug. 2026). Major press outlets have chronicled a growing affordability crisis

in vehicle ownership. *See, e.g.*, Sharon Terlep, *American Consumers Lose Patience with High Car Prices*, Wall Street Journal (Nov. 30, 2025);[1] Kailyn Rhone, *'It's Just Crazy': High Car Payments Make Ownership Feel Impossible*, New York Times (Mar. 16, 2026).[2]

52. At the same time, dealership profitability has surged along with rising prices. Overall dealership profitability is at or near historic highs, propelled in large part by growth in highly lucrative service and parts sales. *See* Kerrigan Advisors, OEM Survey 2026, at 4 (dealer "profitability is likely to remain well above historical norms"); Robert Ferris, *Car Dealerships Are Relying More on Parts and Service for Profits*, CNBC (Aug. 19, 2026).[3] According to Automotive News, the 100 U.S.-based dealership groups reporting the largest service and parts sales in 2025 accounted for $46.8 billion in combined revenue, an increase of 7.7 percent over 2024, and eight of those groups each reported more than $1 billion in revenue on their own. *See* Automotive News Research & Data Center, *2026 Top 100 Dealership Groups: Service & Parts and Body Shop*, at 4, 13–16 (May 10, 2026).

53. Dealerships owned by public companies have been more profitable still: their going-concern value increased 2.3x between 2019 and 2025, even as vehicle sales volumes have declined. Haig Partners LLC, *Haig Report, Q4 2025*, at 6, 8, 19 (Mar. 2026).

---

[1] https://www.wsj.com/business/autos/american-consumers-have-had-it-with-high-car-prices-0eb23424.
[2] https://www.nytimes.com/2026/03/16/business/car-ownership-prices-interest-rates.html.
[3] https://www.cnbc.com/2026/08/19/car-dealerships-parts-and-service.html.

54. On information and belief, dealership service and parts operations ("aftersales" or "fixed operations," in industry parlance) earn average gross margins of approximately 45 to 55 percent, the highest of any department in a dealership. *See* Inga Maurer and Nicolaas Kramer, *Optimizing Dealer Profitability with a Service Center Tune-Up*, McKinsey & Co. (Nov. 19, 2025).[4] Many dealers look to their service and parts profits to cover all of their dealership overhead. *See id.*; Don Hall, *Why Service Is the Largest Single Influence on the Public's Perception of Your Dealership*, NADA Headlines (Oct. 27, 2025);[5] Nat'l Auto. Dealers Ass'n, *2026 Formulas. Definitions. Guides.* (2026).[6]

55. Warranty work, in particular, is highly profitable to dealers. On information and belief, dealers' industry-wide average gross profit margin on warranty labor is close to 80 percent. Performing warranty service also builds dealers' long-term customer-pay service business because warranty customers typically frequent the same dealer for non-warranty work.

56. The same trends prevail in New Jersey. In 2025, the majority of the Manufacturers' New Jersey dealers reported more profits from their service and parts operations than from new and used vehicle sales. Even among dealers that reported a pre-tax loss in 2025, most reported a combined profit from their service and parts operations.

---

[4] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/optimizing-dealer-profitability-with-a-service-center-tune-up.
[5] https://www.nada.org/nada/nada-headlines/why-service-largest-single-influence-publics-perception-your-dealership.
[6] https://slideguide.nada.org/NADASlideGuide.pdf.

57. In fact, franchised dealerships are among the most profitable closely held businesses in New Jersey and nationwide and include several publicly traded corporations with multi-billion-dollar market capitalizations. According to economists from Princeton University and the University of Chicago who examined which industries contribute most to the top 0.1 percent of income earners, auto dealerships ranked third (above doctors' offices and technology services), leading National Public Radio to describe them as "money machines propelling their owners into the top of the income distribution." Greg Rosalsky, *The Powerful Millionaires Hiding in Plain Sight*, NPR Planet Money (Sept. 14, 2026) (citing Owen Zidar & Eric Zwick, *The Everywhere Millionaire: Who Is Really Rich in America and How They Got There* (Henry Holt & Co. 2026)).[7] A recent study showed that owners of more than 6,600 dealerships—more than one in seven in the United States—are among the top 0.1 percent of the income distribution. Matthew Smith, Danny Yagan, Owen Zidar & Eric Zwick, *Capitalists in the Twenty-First Century*, 134 Q.J. Econ. 1675, Online Appendix tbl. J.3 (2019).

58. Four dealership groups headquartered in New Jersey are among the Automotive News "Top 100," and one of them ranked ninth in the nation. Those four groups alone reported approximately $1.42 billion in combined service and parts revenue in 2025, an increase of approximately 11 percent over 2024. One dealership group headquartered in New Jersey increased its service and parts revenue by 24.6

[7] https://www.npr.org/sections/planet-money/2026/09/14/g-s1-143041/the-powerful-millionaires-hiding-in-plain-sight.

percent in 2025 and rose 18 places in the ranking, tied for the largest year-over-year gain of any of the 100 groups on the list. Automotive News Research & Data Center, *supra*, at 4, 12, 13, 15.

59. In short, the Act does not correct for any market failure. Dealers were guaranteed full retail-rate warranty compensation under prior law, their service operations were their most profitable departments, and consumers—not dealers or their owners—were the constituency in need of protection. The Act's inflation of dealer service compensation above reasonable retail rates does nothing to lower the cost of service for any consumer. Worse, by tying manufacturer payments to retail charges while removing any reasonableness check, the Act gives dealers a powerful incentive to raise service and parts prices for the very consumers the Act purports to protect, ultimately leading to higher new car prices and lower demand in the new vehicle market, reduced warranty coverage for new vehicles, and other harmful effects.

## III. The Act Repeals the Reasonableness Limitation from Every Compensation Calculation and Expands to Reach Virtually All Service Work.

60. The Act was approved on September 11, 2025, and took effect on April 1, 2026. *See* P.L. 2025, c. 140 (S.3309; A.4380). Section 7 of the Act comprehensively rewrote N.J.S.A. 56:10-15. The change that received no discussion in the legislative record may have the broadest impact: the Act deleted the reasonableness proviso—the requirement that a dealer's claimed service and parts compensation rates not be "unreasonable when compared with" the rates of comparable area dealers—that had been a core feature of the statute since 1977. The Act kept the words "prevailing retail

price" but redefined them and emptied them of meaning: compensation is now "the prevailing retail price calculated pursuant to" the dealer-declaration formulas described below, whatever those formulas yield, even if unreasonable when compared to market prices. N.J.S.A. 56:10-15(a).

61. The Act substituted no other limitation. As amended, N.J.S.A. 56:10-15 contains no reasonableness requirement, no cap, no benchmark against comparable dealers, and no authority for a manufacturer to adjust a dealer's declared rate based on any market-based rate comparison.

62. Section 7 also expanded the statute's reach. Since 1977, N.J.S.A. 56:10-15 had been triggered by services performed "in satisfaction of a warranty issued by the motor vehicle franchisor"; recall work was governed separately by N.J.S.A. 56:10-7.4(c). Former N.J.S.A. 56:10-15 (introductory clause) (amended eff. Apr. 1, 2026). The Act replaced that trigger with a materially broader one: the section now applies to any "repair service offered and reimbursed by the motor vehicle franchisor, including, but not limited to, a warranty, an extended warranty, a maintenance plan, a service-related plan, or a recall." N.J.S.A. 56:10-15 (introductory clause).[8] A statute that for nearly 50 years governed only warranty reimbursement now governs, on its face, substantially all compensation that a manufacturer pays its New Jersey dealers for service of any kind.

---

[8] The "extended warranties" that the Act reaches are not warranties at all, but service contracts sold to consumers for a separate price.

63. The Act also gutted the Manufacturers' audit rights. Under prior law, a manufacturer's right to audit a dealer's labor-rate submission was unrestricted, and a dealer's parts-markup submission was "subject to audit of the submitted repair orders by the motor vehicle franchisor and adjustment of the average percentage markup based on that audit." Former N.J.S.A. 56:10-15(d) (amended eff. Apr. 1, 2026). As amended, every component of dealer compensation—the labor rate, the labor multiplier, and the parts markup—becomes effective upon the dealer's own "declaration," subject to a far more limited audit right: the manufacturer may conduct an audit "*only* of the sample submitted by the motor vehicle franchisee," with any proposed adjustment "based *only* on an audit of that sample." N.J.S.A. 56:10-15(a), (d), (l), (m) (emphases added).

64. A dealer may demand increases to its declared statutory labor rate, parts markup, and labor multiplier twice every calendar year. N.J.S.A. 56:10-15(n). The Act provides no mechanism by which a manufacturer may initiate a downward adjustment of any declared rate, no matter how far it departs from what the dealer actually charges retail customers or from the prevailing rates in the market.

65. The repeal of the reasonableness safeguard is not a modest or incidental change. It is the load-bearing feature of the entire scheme. Every Compensation Provision depends on the absence of any reasonableness check, and the Audit Limitation and Cost-Recovery Prohibition exist to ensure that no such check can be recreated by contract, audit, or market response.

## IV. The Act's Compensation Provisions Let Dealers Declare Their Own Prices and Prevent Manufacturers from Reducing Parts Prices.

66. In place of the repealed retail-price standard, the Act enriches dealers through the Compensation Provisions: the Dealer-Declared Rate Provisions, N.J.S.A. 56:10-15(d), (l), (m), of which the Labor Multiplier is the most aggressive; the Reduced-Cost Parts Markup, N.J.S.A. 56:10-15(e); and the Parts-Pricing Restriction, N.J.S.A. 56:10-15(q). Each is addressed in turn.

### A. The Dealer-Declared Rate Provisions and the Labor Multiplier, N.J.S.A. 56:10-15(d), (l), (m).

67. As amended, N.J.S.A. 56:10-15 ties labor reimbursement to a three-factor, dealer-driven formula: the dealer's declared "average retail labor rate," N.J.S.A. 56:10-15(l), which is an hourly rate, multiplied by the hours assigned by the manufacturer's time guide, multiplied by a declared "average retail labor time allowance" (or "labor multiplier"), N.J.S.A. 56:10-15(m). The labor multiplier is generated by dividing the hours that a dealer *billed* customers in a sample of repair orders by the hours that the manufacturer's time guide *allots* for the same repairs, N.J.S.A. 56:10-15(m). Both the retail rate and the labor multiplier are dealer-declared inputs derived from samples of 100 sequential customer-paid repair orders (or 90 days of repair orders, whichever is less) that the dealer itself selects. *Id.* The dealer's parts markup is likewise declared from a dealer-selected sample of repair orders. N.J.S.A. 56:10-15(d). None of the three declared inputs is subject to any reasonableness check, and none may be tested against what comparable dealers charge.

68. The formula allows and produces rate manipulation and compensation above retail rates. The dealer chooses when its 100-order "sequential" sample begins and can therefore generate an inflated multiplier by composing its sample with non-representative types of repairs, a period of time when it charges higher-than-usual retail prices, or both.

69. The Act also strictly limits the types of repairs that qualify as rate-setting, excluding 15 distinct categories of lower-cost customer-paid work, N.J.S.A. 56:10-15(j)(1)–(3), such as routine maintenance (*e.g.*, replacing brakes, fluids, filters, batteries, and belts); tire replacements, rotations, and alignments; repairs of collision, road-hazard, and weather damage; accessories; vehicle reconditioning; and goodwill or policy repairs (collectively, the "Excluded Work"), regardless of whether, or the extent to which, it bears any similarity to warranty work.

70. Much of the Excluded Work—maintenance, tires, and other menu-priced services—is the highest-volume, lowest-priced work that a dealership performs: dealers price it from menus, at rates disciplined by competition from independent shops, and it consumes little labor time. The remainder—wholesale, insurer, and government work—is priced in channels where the dealer faces negotiated or competitive price discipline. The Act excludes all of the foregoing from the repair orders used to compute the dealer's labor rate, labor multiplier, and parts markup. N.J.S.A. 56:10-15(j)(1)–(3). Each declared figure therefore reflects only the dealer's higher-priced, more labor-intensive repair work, and overstates what the dealer's retail customers pay across its service business as a whole.

71. The Act then requires manufacturers to pay those inflated figures *even for Excluded Work*—*i.e.*, for any "repair service offered and reimbursed by the motor vehicle franchisor, including, but not limited to, a warranty, an extended warranty, a maintenance plan, a service-related plan, or a recall," N.J.S.A. 56:10-15 (introductory clause). Brakes, fluids, and filters replaced under a maintenance plan; tires and alignments under a tire-and-wheel plan; accessories under an accessory warranty; and goodwill and policy repairs—all of which the Act excludes from the rate-setting sample by name, N.J.S.A. 56:10-15(j)(1)–(3)—are, by definition, repair services "offered and reimbursed by the motor vehicle franchisor."

72. The result is compensation consistently above retail, including for the complimentary scheduled-maintenance programs that several Manufacturers include with the purchase of a new vehicle. A manufacturer pays for a brake job or an oil change performed under its own maintenance plan at a labor rate, a labor multiplier, and a parts markup computed by excluding brake jobs and oil changes. By the statute's design, that compensation exceeds what the same dealer charges any retail customer for the identical service. The same is true of every other category of Excluded Work the Act compensates.

73. The formula gives every dealer a direct financial incentive to raise the prices it charges its own customers. Under N.J.S.A. 56:10-15(l), a dealer's statutory labor rate is the average rate that it billed retail customers in its sample; under N.J.S.A. 56:10-15(m), its labor multiplier is the ratio of the hours that it billed those customers to the hours that the manufacturer's time guide allots. Each increase in a

dealer's retail labor rate, and each additional fractional hour billed to a retail customer beyond the time that a repair requires, thus flows directly into the rate that the manufacturer must pay on every warranty repair that the dealer performs—work that, on information and belief, comprises one-third or more of a typical dealer's service business.

74. A dealer needs to sustain the higher retail charges only long enough to generate a qualifying sample of 100 repair orders. On information and belief, the average New Jersey dealership can generate 100 repair orders in only a week. The resulting statutory rate then applies for at least six months, under N.J.S.A. 56:10-15(n), and can only be raised. The Act thus rewards dealers for charging consumers more. The New Jersey consumers that the Act purports to protect pay the inflated charges that set the rate, and manufacturers then pay those charges again, multiplied across their entire manufacturer-paid service volume in perpetuity or until the dealer demands another increase.

75. The labor multiplier compels manufacturers to pay for time that no one works. A dealer with a $150 per hour retail labor rate and a declared 2.0 labor multiplier performing a repair that is allotted 2.0 hours under the manufacturer's time guide would receive $600 for that repair: payment for 4.0 hours of labor on a job that should have required no more than 2.0 hours. That the dealer may also bill its retail customers on the same inflated basis—at least for a brief period necessary to generate the 100-repair sample—does not make the phantom hours real. And because the labor multiplier is derived from a dealer-selected sample that excludes lower-

intensity work and then is applied to every manufacturer-paid repair that the dealer performs, it exceeds even the dealer's actual retail billing across its manufacturer-paid repair mix.

76. The labor multiplier does not correct for any under-compensation of dealers for actual time worked. On information and belief, all manufacturers have a process that allows dealers to obtain compensation for the actual time that it takes to complete a manufacturer-paid repair where it exceeds the manufacturer-defined time allowance. Thus, a dealer that legitimately needed 4.0 hours to complete a job allotted 2.0 hours under a manufacturer's time guide would typically be paid for all 4.0 hours. On information and belief, all manufacturers also have processes for dealers to challenge time allowances that they contend are too low.

77. Charging statutory rates inflated through a selected sample of 100 more expensive repair orders also strengthens dealers' incentives to raise their retail rates. Dealers must balance demand for their retail and warranty services. Providing retail services can crowd out more profitable warranty services for dealers charging inflated statutory rates and facing labor-capacity or other constraints. Dealers thus have an incentive to raise their retail rates to ensure that they have the available capacity to complete the more profitable warranty services.

78. The dealer's declared rate and labor multiplier become effective 30 days after declaration, and, as detailed in Section V.A below, the manufacturer's audit is confined to the dealer's own sample. As alleged above, the dealer may raise its declared rates twice per calendar year, and the manufacturer may never lower them.

79. Under the new statutory framework, New Jersey dealers can inflate the labor hours billed to customers for a short submission period to generate a high labor multiplier and increase the hourly labor rate and reduce the hours billed for a separate submission period to generate a higher hourly labor rate.

80. These predictable results of the Act are not hypothetical. In the months since April 1, 2026, dealers across New Jersey have declared labor rates and multipliers yielding compensation far above what is reasonable and what those dealers charge retail customers for identical work. Each Manufacturer has already received submissions for labor multipliers and increased labor rates from dozens of its New Jersey dealers. The requested rates far exceed reasonable limits—certain dealers have submitted labor multipliers of more than three, effectively demanding that their manufacturer-paid compensation be tripled based on the multiplier alone.

81. On information and belief, the multiplier is leading and will lead to increased retail prices for consumers: a dealer with a $150 per hour labor rate and a 2.0 multiplier will not continue performing retail labor at $150 per hour. Because the dealer is effectively being paid $300 per hour for warranty labor, it may increase its retail labor rate to make the profitability of those hours more closely match its warranty labor profits.

82. On information and belief, NJ CAR has assisted New Jersey dealers in preparing submissions designed to maximize declared rates, including by recommending consultants whose business is maximizing declared rates, which is irreconcilable with NJ CAR's assurance to the legislature that dealers would receive

only "the same retail price a consumer pays." And NJ CAR, on behalf of its dealer members, has written to one Manufacturer demanding that it comply with the Act, including the Dealer-Declared Rate Provisions.

**B. The Reduced-Cost Parts Markup, N.J.S.A. 56:10-15(e).**

83. Manufacturers routinely adjust their parts price lists, frequently finding methods of reducing prices through, for example, lowered material costs or renegotiated arrangements with suppliers. These reductions can be substantial: manufacturers provide certain parts at no cost or for as little as one penny. When manufacturers reduce prices, dealers can pass those savings on to their retail customers while still maintaining their own margins on the transactions.

84. Prior to the Act, dealers were entitled to reimbursement for parts used in warranty repairs at the "prevailing retail price charged by [the] motor vehicle franchisee," defined as the price paid by the dealer multiplied by its parts markup—so long as that price was "not unreasonable" in comparison to other dealers' prices. Former N.J.S.A. 56:10-15(a), (d) (amended eff. Apr. 1, 2026). This markup obligation was limited to warranty parts, as prior New Jersey law imposed no markup on parts used in repairs performed under recalls, extended warranties, or other maintenance plans.

85. As amended, N.J.S.A. 56:10-15(e) extends the parts markup for the first time to recall parts, and applies it expressly to parts supplied under extended warranties, maintenance plans, and service-related plans, and to any "other work that is also offered and reimbursed by the motor vehicle franchisor." When a manufacturer supplies a part "at no cost or at a reduced cost," it must pay the dealer

the dealer's cost of the part "if any," plus "an amount equal to the franchisee's parts markup multiplied by the wholesale value of the part." N.J.S.A. 56:10-15(e)(1).

86. The "wholesale value" of a free or reduced-cost part is defined as the *greatest* of several measures, including the part's cost in any "current or prior established price schedule issued by the motor vehicle franchisor" or by a third party. N.J.S.A. 56:10-15(e)(1)(b)–(c). The highest price that a part has ever carried—including temporary spikes during supply shortages—thus becomes the permanent floor for the markup calculation. When manufacturers devise ways to lower the prices that dealers pay for parts, there is no corresponding decrease in dealer reimbursement. And because the statute prices each part separately, manufacturers that supply parts as an integrated kit—for which the price is less than the sum of its components—must nonetheless pay markups computed on the higher, component-by-component prices that the manufacturer never charged.

87. The Act thus requires compensation for parts used in manufacturer-paid repairs at rates far exceeding those paid at retail. Any time a manufacturer reduces the price of a part, it must still reimburse the dealer with its markup on a "wholesale value" that bears no relationship to what the dealer actually paid for the part. Without a reasonableness backstop, manufacturers must pay dealers substantial reimbursements for parts that they have already provided to the dealers for free or nearly free.

### C. The Parts-Pricing Restriction, N.J.S.A. 56:10-15(q).

88. The Act goes beyond regulating the amount of reimbursement that manufacturers must pay on reduced-price parts by dictating when and how they can reduce parts prices in the first place.

89. The Parts-Pricing Restriction freezes a manufacturer's prior pricing decisions in place. A manufacturer may not "reduce" the price of parts required in manufacturer-paid repairs in any manner that "unilaterally" lowers dealer compensation, a prohibition that the statute declares to include price changes "within 60 or fewer days preceding an announcement of a recall, any time after a recall, or after a warranty claim has arisen." N.J.S.A. 56:10-15(q). A manufacturer also may not introduce a new part number for the same part in a manner that lowers dealer compensation. *Id.*

90. Like the Reduced-Cost Parts Markup, this restriction sets a permanent floor on parts prices, raising the prices paid by consumers and ultimately driving down demand for new cars. Parts that are used in warranty and recall repairs—and thus are subject to the Parts-Pricing Restriction—may also be used by dealers in retail repairs. The Parts-Pricing Restriction prevents manufacturers from lowering prices for those parts, even where dealers use them for customer-paid repairs.

## V. The Act Prohibits Any Meaningful Audit, Challenge, or Recovery of the Dealers' Declared Compensation.

### A. The Audit Limitation, N.J.S.A. 56:10-15(a), (d), (l), (m).

91. Having empowered dealers to declare their own compensation, the Act places those declarations beyond meaningful review. For every component of dealer

compensation—labor rate, labor multiplier, and parts markup—the Act permits an audit "by the motor vehicle franchisor only of the sample submitted by the motor vehicle franchisee" and requires that any proposed adjustment "be based only on an audit of that sample." N.J.S.A. 56:10-15(a), (d), (l), (m). The dealer's cherry-picked sample is beyond critique, as a manufacturer is forbidden from testing it against the dealer's overall repair mix, its actual retail charges outside the sample, or the rates of comparable dealers—the very comparison that the repealed reasonableness proviso required for nearly half a century before the Act was adopted.

92. The Act further provides that a manufacturer may not deny or charge back a claim unless the manufacturer "satisfies its burden of proof that the motor vehicle franchisee did not make a good faith effort to comply with the reasonable written procedures of the motor vehicle franchisor, that the motor vehicle franchisee did not actually perform the work, or that the claim was materially false or fraudulent." N.J.S.A. 56:10-15(p). The provision governs claims already submitted and paid, foreclosing after-the-fact correction.

93. The result is that the nominal audit right is illusory. A manufacturer may check the dealer's hand-picked sample for compliance with statutory submission requirements, arithmetic errors, and outright falsification—nothing more. No inquiry is permitted into whether the declared rate bears any relationship to what the dealer charges other retail customers, and no showing of unreasonableness, however extreme, permits the manufacturer to reject or adjust a declared rate. A dealer that lawfully engineers its sample to double, triple, or even quadruple its compensation

has, by the statute's design, done nothing that the manufacturer can challenge, and the manufacturer can never reduce its compensation, even if the dealer lowers the prices it charges its retail customers.

**B. The Cost-Recovery Prohibition, N.J.S.A. 56:10-15(o).**

94. The Act then forecloses the ordinary market response to a compelled cost: recovering it. Under N.J.S.A. 56:10-15(o), a manufacturer "shall not recover its costs . . . from a motor vehicle franchisee within this State, including, but not limited to," through "an increase in the wholesale price of a vehicle or a surcharge imposed on a motor vehicle franchisee" intended to recover the cost of the compensation that the section compels.

95. On its face, and by its "including, but not limited to" terms, the Cost-Recovery Prohibition prohibits every mechanism by which a manufacturer might recover the Act's costs from New Jersey dealers: wholesale price increases and surcharges by name, and all other mechanisms by extension. The provision's final sentence preserves only price increases "in the normal course of business"—that is, increases unrelated to recovering the Act's costs—affording no avenue for recovery of the compelled payments. On information and belief, NJ CAR and its members construe the Cost-Recovery Prohibition to prohibit any New Jersey price increase or charge attributable to the Act's costs and will invoke it—backed by the NJFPA's damages, injunction, and fee-shifting remedies, N.J.S.A. 56:10-10—against any Manufacturer that attempts to recover the Act's costs in New Jersey.

96. The arithmetic that follows is simple. The Act's costs must come to rest somewhere, and the Cost-Recovery Prohibition dictates where they may not: on any

New Jersey dealer, by any means. By statutory design, the burden of enriching New Jersey's dealers is placed on the Manufacturers—none of which may recover it from the parties that the Act enriches—or on out-of-state dealers, and thus on interests outside New Jersey. The State has arranged for its dealers to receive a windfall and for the bill to be paid by everyone else.

## VI. The Act Retroactively Imposes a Closed Extraction System from Which Manufacturers Have No Lawful Escape.

97. No Manufacturer agreed (nor would any rational party agree) to a contract under which its counterparty alone sets the price, may raise it twice a year, and is immune from the one response that every other seller faces—the loss of its customer. The Act anticipates as much: it operates in concert with preexisting NJFPA provisions to close every procedural, commercial, or structural avenue by which a manufacturer might avoid, mitigate, or recover the compelled payments. The Act thus purports to retroactively rewrite the Manufacturers' dealer agreements, which together with the policies and procedures that those agreements incorporate reserve to the Manufacturer the right to establish the methodology for determining warranty and recall compensation, standard time allowances for repairs, the amount of compensation for parts, procedures for disputed costs, and rates and standards for dealer warranty labor.

98. A manufacturer subject to the Act may not: (a) refuse to pay a dealer's declared rates, on pain of damages, injunctive relief, and mandatory attorneys' fees, N.J.S.A. 56:10-10, and subject to the claim-denial restrictions of N.J.S.A. 56:10-15(p); (b) restrict the nature or extent of the warranty services that dealers perform,

N.J.S.A. 56:10-15(b); (c) perform warranty or recall service itself or engage independent repair facilities to perform it, N.J.S.A. 56:10-7.4(e), -27, -28; (d) audit any dealer repair orders beyond the dealer's own sample, N.J.S.A. 56:10-15(a), (d), (l), (m), as described above; (e) recover its costs from any New Jersey dealer by any mechanism, N.J.S.A. 56:10-15(o); (f) reduce or restructure its own parts prices in ways that would lower dealer compensation, N.J.S.A. 56:10-15(q); (g) terminate, cancel, or decline to renew the franchise of a dealer that declares exorbitant rates, absent "good cause" defined as the dealer's substantial breach of its franchise obligations, N.J.S.A. 56:10-5; or (h) withdraw from the New Jersey market, except upon paying every dealer the fair market value of its franchise, repurchasing inventory, parts, and equipment, and continuing to supply parts and fund warranty service—at the Act's rates—for five years after withdrawal, N.J.S.A. 56:10-13.2, -13.3.

99. The exit provisions convert the Act's obligations into a toll that must be paid whether a manufacturer stays or goes. A withdrawing manufacturer must pay each New Jersey dealer at least the fair market value of the franchise, N.J.S.A. 56:10-13.3(b)—a value that now capitalizes the dealer's expected future income stream from the Compensation Provisions themselves—and must separately continue reimbursing warranty service at statutory rates no less favorable than those in effect before withdrawal for at least five years, N.J.S.A. 56:10-13.3(c). The statute permits a reduction of the fair-market-value payment to the extent of the continuing service rights, N.J.S.A. 56:10-13.3(e), but the structure remains: the price of leaving New

Jersey includes the present value of the very payments that the manufacturer would leave the State to escape.

100. The system, in sum, is a one-way ratchet. The dealer selects the samples (which can be different for each of the labor rate, labor multiplier, and parts markup submissions); the samples dictate the rates; the rates bind the manufacturer; the manufacturer cannot verify, contest, offset, recover, redirect, terminate, or exit. Each provision reinforces the others, and the whole is calculated to do what no single provision could accomplish alone: compel a continuing, compounding transfer of wealth from manufacturers to New Jersey dealers, on terms that the dealers themselves unilaterally dictate without market restraints.

## VII. The Act Reaches Vehicles Sold and Warranted in Other States.

101. A new vehicle's warranty terms are fixed at the point of wholesale and typically activate when the vehicle is sold or delivered to the retail buyer. Once the warranty terms are fixed, the manufacturer cannot revisit them, and it must perform the obligations that it assumed. Every new vehicle sold before April 1, 2026, therefore carries a warranty whose price was fixed—and paid—before the Act existed.

102. The Act, however, applies to warranty, extended warranty, and recall service performed in New Jersey regardless of when or where the vehicle is sold. A vehicle purchased and warranted in Pennsylvania, Texas, Florida, or Washington—in a transaction completed there, even years before the Act existed—becomes subject to the Compensation Provisions the moment its owner moves to or travels through New Jersey and obtains service there. The Act thereby attaches new, dealer-declared obligations to completed out-of-state transactions that the Manufacturers cannot

reopen or adjust, and the Cost-Recovery Prohibition forbids recovery in New Jersey of the costs that New Jersey has added.

103. The Act also distorts competition across State lines. New Jersey dealers—many of which compete directly with dealers in the New York, Philadelphia, and Wilmington metropolitan markets that span State borders—receive a manufacturer-funded revenue stream that no neighboring State provides to the dealers with which they compete. That subsidizes New Jersey dealerships at the expense of out-of-state interests and manufacturers.

## VIII. Federal Law Establishes a Comprehensive Motor Vehicle Safety Recall Regime.

104. The National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq*. (the "Safety Act"), establishes a comprehensive federal framework governing motor vehicle safety recalls. Its stated purpose is to "reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. To carry out this purpose, the Safety Act and its implementing regulations commit to the National Highway Traffic Safety Administration ("NHTSA") the administration of the recall process, including defect investigations, notification requirements and schedules, and the adequacy and timing of remedies.

105. NHTSA identifies safety defects through "testing, inspection, investigation, or research" and, after notice and an opportunity to be heard, may order manufacturers to notify vehicle owners and dealers of the safety defect and to remedy it. 49 U.S.C. § 30118. The contents, timing, and means of providing such notifications are dictated by the Safety Act. 49 U.S.C. § 30119.

106. Manufacturers must remedy safety defects without charge to the consumer, 49 U.S.C. § 30120(a)(1), and supply the parts required for recall remedies to their dealers in discharge of that federal obligation.

107. Congress has also addressed what dealers are paid for recall work, and the measure it chose is reasonableness. A manufacturer must pay "fair reimbursement" to a dealer that provides a recall remedy. 49 U.S.C. § 30120(f)(1). When a defect is found in a new vehicle before the dealer sells it, the manufacturer must either repurchase the vehicle at the dealer's price plus "reasonable reimbursement of at least one percent a month" or supply the part at its own expense and pay the dealer "the reasonable value of the installation" plus the same monthly reimbursement. 49 U.S.C. § 30116(a)–(b). If the parties cannot agree on those amounts, the dealer may sue in federal court to recover them. *Id.* § 30116(c). Federal law likewise forbids a dealer from selling a new vehicle subject to an open recall until the defect is remedied. 49 U.S.C. § 30120(i).

108. New Jersey's prior law operated consistently with this federal regime, but the Compensation Provisions, including the repeal of the reasonableness safeguard, obstruct the federally established scheme for the administration of recalls.

**IX. The Challenged Provisions Serve No Legitimate Purpose.**

109. The Challenged Provisions cannot be squared with any purpose other than pure economic protectionism. They were the product of a sustained lobbying campaign by NJ CAR, which has publicly taken credit for the law. NJ CAR's chairman has described how the association "made a major investment in a public relations campaign" in order "[t]o enhance our messaging to the public and influence

decision-makers in Trenton," enabling NJ CAR to "demonstrate a positive, consumer-focused" image for the bill. *See* Ron E. Baus, Jr., *Let's Celebrate Advancing Safety and Fair Pay*, New Jersey Auto Retailer, NJ CAR (Apr. 29, 2026).[9]

110. In its formal issue brief to the legislature, NJ CAR framed the bill as an effort to "improve recall completion rates and enhance highway safety" and assured legislators that its compensation provisions would simply establish "labor times that mirror what the retail customer pays for similar repairs" and require "automakers to pay dealers the same retail price a consumer pays for recall repairs." NJ CAR Issue Brief (Mar. 3, 2025).[10] NJ CAR's president has repeated those assurances since enactment, asserting that the Act's "intention" is that the "manufacturer should pay the same as the retail customer," based on the "true labor time that it takes" to perform the work. Ashby Lincoln, *New Jersey Law Ensures Fair Pay for Dealer Recall and Warranty Work – Laura Perrotta | NJ CAR*, CBT News (Sept. 30, 2025) (video interview at 02:30, 04:39).[11]

111. Legislators' own statements of purpose confirmed that the Act's aim was to shift costs onto manufacturers and to subsidize local dealers. The Act's Senate sponsor stated that "[i]t is important that as a legislative body we stand up for our local, small business owners and their workforce." Its co-sponsor stated that the law

---

[9] https://new-jersey-auto-retailer.thenewslinkgroup.org/lets-celebrate-advancing-safety-and-fair-pay/.

[10] https://www.njcar.org/wp-content/uploads/2025/03/Recall-Bill-Issue-Brief-3-3-25.pdf.

[11] https://www.cbtnews.com/new-jersey-law-ensures-fair-pay-for-dealer-recall-and-warranty-work-laura-perrotta-nj-car/.

"will now ensure that the financial burden and responsibility of vehicle recalls falls on the" manufacturers.

112. Propelled by this campaign, the Act passed without meaningful debate about the Compensation Provisions. The legislature's amended findings recite an "inequality of bargaining power" between manufacturers and dealers; a "compelling public interest" in a network of independently owned dealers to provide sales, warranty, recall, and routine service; and a concern that dealers have found it "too risky" or "too burdensome" to enforce their existing rights against manufacturers. N.J.S.A. 56:10-7.2(a)–(g). The findings describe the Act itself modestly, as an effort to "strengthen and clarify certain provisions of existing law." N.J.S.A. 56:10-7.2(h). No finding states that dealers were undercompensated for warranty or recall work, that any dealer had curtailed that work, or that the retail-price standard and reasonableness safeguard in force since 1977 had failed. And nothing in the findings or the legislative record acknowledges that the Act would repeal the retail-price standard, delete the reasonableness safeguard, compel above-retail compensation, or effect any of the wealth transfers described below.

113. The Challenged Provisions bear a rational nexus to none of these rationales.

114. The Act already addresses any dealer reluctance to litigate directly by granting dealer trade associations standing to sue on dealers' behalf. N.J.S.A. 56:10-34. Removing the reasonableness safeguard and compelling above-retail

compensation does nothing further to help dealers enforce lawful rights; rather, it creates unlawful new entitlements that no dealer previously had.

115. The inequality-of-bargaining-power finding fares no better. Inequality of bargaining power is a reason to police the terms that one party imposes on another. It is not a reason to hand the supposedly weaker party unilateral control over the price and then forbid the other party from checking it. The Challenged Provisions do not equalize bargaining over manufacturer-paid compensation; they eliminate it.

116. The Act also has no connection to preserving networks of independent dealers to perform service. No legislative finding states, and nothing in the legislative record suggests, that any New Jersey dealer has closed or even curtailed warranty or recall service for want of compensation. Dealers were already obligated, by contract and by N.J.S.A. 56:10-7.4, to perform that service and were already compensated for it at retail. Paying them above retail does not make service more available. It makes service more expensive, and it does so at the expense of retail customers and for the benefit of businesses that are among the most profitable closely held enterprises in the country.

117. Nor do the Challenged Provisions serve the Act's ostensible safety and consumer-protection purposes. The Manufacturers do not challenge the Act's recall-notification provisions, which address consumer awareness of open recalls. The Challenged Provisions, by contrast, do not notify a single consumer, repair a single vehicle, or reduce the price of a single repair. They set the price that manufacturers pay dealers—well above retail—and prohibit recovery. As the American Consumer

Institute explained to the legislature, such laws move "money from consumers to dealers' pockets" by increasing manufacturer costs without any attendant benefit. Am. Consumer Inst., Public Comments (Mar. 5, 2025).

118. The technician-wage rationale pressed by the Act's labor proponents is equally illusory. The Act's sole nod to technicians is a single unelaborated clause providing that, upon payment of a labor claim, the dealer "shall compensate its factory-certified flat rate technicians performing" the work. N.J.S.A. 56:10-15(m). The clause states no amount, no formula, no share of the dealer's enhanced compensation, and no enforcement mechanism. Dealers are already required to compensate their technicians; the clause requires nothing more, and nothing in the Act obligates dealers to pass any portion of their new revenues through to the technicians whose wages purportedly animated the campaign for passage. The windfall belongs to the dealership, to use however its owners desire.

119. Dealers' own advisors have said as much. Weeks before the Act's effective date, counsel for dealers publicly described the Act as a "warranty reimbursement windfall" and urged dealers to "act now" to capture it. *See* Fox Rothschild LLP, *New Jersey Dealers: Prepare Now for April 1 Warranty Reimbursement Windfall* (Mar. 16, 2026).[12]

120. The magnitude of the transfer confirms its character. NJ CAR's president has favorably cited testimony estimating that the Act would shift $145

---

[12] https://www.foxrothschild.com/publications/new-jersey-dealers-prepare-now-for-april-1-warranty-reimbursement-windfall.

million per year to New Jersey dealers. Ashby Lincoln, CBT News, *supra* (video interview at 07:57). On information and belief, the true figure will be more than double that, as the Challenged Provisions will transfer $375 million or more per year, and approaching $2 billion over the next five years, from the Manufacturers and other automakers to New Jersey dealers.

121. A wealth transfer of that scale—conferred on a single politically influential in-state industry; extracted from out-of-state payors; secured by the deletion of a nearly 50-year-old safeguard that appears nowhere in the sponsors' statements, committee statements, or legislative findings; and insulated from every market response—is not rational and is not regulation in the public interest. It is a legislative handout, procured by its beneficiaries, dressed in the language of safety and fairness.

## I. The Act's Challenged Provisions Are an Integrated, Non-Severable Scheme.

122. The Challenged Provisions were enacted together, as Section 7 of a single bill, supported by a single set of legislative findings (Section 6) and a single enforcement architecture (Section 3), and they operate as an integrated whole. The Compensation Provisions depend on the Audit Limitation and Cost-Recovery Prohibition to achieve their extractive effect; the Audit Limitation and Cost-Recovery Prohibition have no function except to protect the Compensation Provisions; and every provision is premised on the repeal of the reasonableness safeguard. None of the Challenged Provisions can operate as the legislature intended without the others.

123. The legislature would not have enacted the components of this scheme independently. The Challenged Provisions of the Act rise or fall together. Accordingly, if any core component of the Challenged Provisions is unconstitutional, Section 7 of the Act is invalid in its entirety and a nullity, and the prior law of New Jersey—including the retail-price standard and reasonableness proviso of former N.J.S.A. 56:10-15—continues to govern.

## II. The Act Is Operating as Designed, and an Actual Controversy Exists.

124. Each Manufacturer has been subject to the Challenged Provisions since April 1, 2026, and each has sustained and continues to sustain concrete injury under them.

125. Between April 1, 2026, when the Act took effect, and November 1, 2026, Ford has received submissions from at least 31 dealers declaring average retail labor rates and/or multipliers under N.J.S.A. 56:10-15(l) and (m), including declared rates as high as $259.88 per hour and labor multipliers as high as 3.13.

126. Between April 1, 2026, when the Act took effect, and November 1, 2026, FCA US has received submissions from at least 46 dealers declaring average retail labor rates and/or multipliers pursuant to N.J.S.A. 56:10-15(l) and (m), including declared rates as high as $397 per hour and multipliers as high as 3.58.

127. Between April 1, 2026, when the Act took effect, and November 1, 2026, Honda has received submissions from at least 46 dealers declaring average retail labor rates and/or multipliers pursuant to N.J.S.A. 56:10-15(l) and (m), including declared rates as high as $268.59 per hour and multipliers as high as 3.41.

128. Between April 1, 2026, when the Act took effect, and November 1, 2026, VWGoA has received submissions from at least 34 dealers declaring average retail labor rates and/or multipliers pursuant to N.J.S.A. 56:10-15(l) and (m), including declared rates as high as $309.99 per hour and multipliers as high as 2.52.

129. These submissions and declarations from dealers upend the Manufacturers' existing contracts with the dealers. Moreover, the Manufacturers are prevented from invoking their preexisting contractual right to reduce the prices of parts used in recalls, warranty, extended warranty, and other maintenance plan repairs under the Parts-Pricing Restriction, N.J.S.A. 56:10-15(q), and each Manufacturer has received or will receive dealer claims for Reduced-Cost Parts Markup payments under N.J.S.A. 56:10-15(e).

130. In responding to dealer declarations under the Challenged Provisions, each Manufacturer has expressly reserved its rights and disclaimed any waiver, informing dealers that any payments made under the Act are made under compulsion of law and do not constitute acquiescence in the validity of the Challenged Provisions. Each payment that the Manufacturers have made or will make under the Challenged Provisions has been and will be made under compulsion of law, not voluntarily.

131. The Manufacturers' compliance is coerced. Refusal to pay declared rates exposes a Manufacturer to damages actions, injunctive relief, and mandatory fee awards under N.J.S.A. 56:10-10—now including industry-wide enforcement actions by NJ CAR under N.J.S.A. 56:10-34—while the NJFPA's termination and withdrawal provisions foreclose any lawful path out of the obligations, as alleged above. A

Manufacturer's only lawful choices are to pay whatever dealers declare or to pay the full statutory price of exit, which capitalizes the same obligations.

132. The controversy is live on both sides. The Attorney General, on information and belief, maintains that the Challenged Provisions are valid and will defend and enforce them. NJ CAR procured the Act, has statutory enforcement authority, has publicly celebrated and claimed that authority, has demanded compliance from at least one Manufacturer, and, on information and belief, is assisting dealers in obtaining payments under the Challenged Provisions and contends that the Challenged Provisions are valid and enforceable against the Manufacturers. Absent relief, the Manufacturers will continue to suffer irreparable and unrecoverable losses each month the Challenged Provisions remain in force.

## CLAIMS FOR RELIEF

### COUNT I
### (Contracts Clause of the U.S. Constitution, Art. I, § 10, cl. 1)
### (By All Plaintiffs Against Both Defendants)

133. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

134. The Contracts Clause forbids the States from passing laws that substantially impair contractual obligations unless the impairment is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

135. Each Manufacturer is party to preexisting dealer agreements with its New Jersey dealers. Those agreements, directly and through the policies and procedures they incorporate, reserve to the Manufacturer the right to establish the

methodology for determining warranty and recall compensation, including the use of the Manufacturer's labor-time guides and the Manufacturer's formula for parts compensation. They also confer on the Manufacturer the right to approve each dealer's warranty labor rate under standards that the Manufacturer sets, including that the rate not exceed the rate that the dealer actually charges its retail customers.

136. Every application of the Act reaches and retroactively invalidates preexisting "motor vehicle franchise agreements in effect on or after" April 1, 2026. P.L. 2025, c. 140, § 8. And because the NJFPA severely restricts a Manufacturer's ability to decline to renew a dealer agreement or to disapprove the sale of a dealership, N.J.S.A. 56:10-5, -6, the Act's terms attach not only to current agreements but also to their compelled renewals and to successor agreements executed in dealership transfers, which continue the same material terms for the same locations under new ownership. The Act likewise reaches every warranty already issued under those agreements: the Manufacturers' obligations to reimburse dealers for warranty and recall service on vehicles sold before April 1, 2026, arise under dealer agreements that predate the Act, for warranties whose price was fixed and paid at the point of sale and cannot now be adjusted. And the Act reaches every service offering, contract, or prepaid maintenance plan sold before April 1, 2026, on which service remains to be performed: products priced against the reimbursement terms then in effect, whose price the consumer has already paid, and which cannot now be repriced.

137. The Challenged Provisions substantially impair those agreements. The parties contracted against, and their agreements incorporate, a statutory regime

under which dealer compensation was tethered to the dealer's actual retail prices, expressly bounded by a reasonableness comparison with the prices of other area dealers, and subject to manufacturer audit and adjustment. The Act purports to remove each of those binding terms and to add obligations found nowhere in the parties' bargain: it substitutes rates, markups, and labor multipliers, unilaterally declared by the dealer, that the Manufacturer cannot test against any market measure; compels markup payments on parts that the contracts contemplate being supplied at no or reduced cost; hampers Manufacturers' abilities to set parts prices; and bars the Manufacturers from the cost-recovery measures that would otherwise permit performance of the altered bargain to be commercially rational.

138. The impairment was not foreseeable. For the entire history of warranty-reimbursement regulation in New Jersey—from 1977 through March 31, 2026—dealer compensation was tethered to actual retail prices and bounded by an express reasonableness safeguard, with manufacturer audit and adjustment rights preserved at every step. No New Jersey statute had ever handed one contracting party the unilateral power to declare the prices and hours that its counterparty must pay for. None had immunized those declarations from market forces, audit, and adjustment; prohibited the counterparty from recovering the resulting costs; or foreclosed termination and exit, let alone all at once. Parties contracting against a background of regulated *reasonable* compensation could not have foreseen a regime whose defining feature is the abolition of reasonableness itself.

139. Nor are the Challenged Provisions drawn in an appropriate and reasonable way to advance any significant and legitimate public purpose. The legislative findings recite an inequality of bargaining power, an interest in preserving a network of independent dealers, and dealer reluctance to enforce existing rights. As alleged above, the Challenged Provisions advance none of those purported interests, and the one concrete concern—dealer reluctance to litigate—is fully addressed by the Act's associational-standing provision. N.J.S.A. 56:10-34. The wholesale transfer of contractual pricing power—unbounded by reasonableness, insulated from audit, and protected by a recovery bar—bears no relationship to those purposes or to any purpose beyond enriching the dealers who procured the legislation. Even a legitimate dealer-protection objective could not justify means this extreme, this unbounded, and this disproportionate to any problem that the legislature identified.

140. The Challenged Provisions accordingly violate the Contracts Clause on their face, individually and in the aggregate, and the Manufacturers are entitled to a declaration that the Challenged Provisions are facially invalid under the Contracts Clause and an injunction against their enforcement.

**COUNT II**
**(Takings Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution)**
**(By All Plaintiffs Against Both Defendants)**

141. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

142. The Takings Clause of the Fifth Amendment, as applied to the States through the Fourteenth Amendment, forbids the taking of private property for public

use without just compensation and forbids outright the taking of private property for a *private* use, with or without compensation. Money is property within the meaning of the Takings Clause, and a state law that compels the transfer of funds linked to a specific, identifiable property interest from one private party to another effects a *per se* taking, without regard to the factors that govern regulatory takings claims.

143. The Labor Multiplier appropriates a specific, identifiable, and precisely calculable fund. For each manufacturer-paid repair, the difference between the compensation that the Manufacturer's time guide and dealer agreement provide for the repair performed (including actual time worked that exceeds the allotted time allowance) and the larger amount that the Act's dealer-declared formula compels. That differential is payment for phantom hours—repair time that no technician worked and for which no retail customer was charged—and it is calculable to the dollar, claim by claim, from repair records. Absent the Act, each Manufacturer would retain those funds; the Act appropriates them and directs them to private dealers for no legitimate public use or purpose.

144. The Reduced-Cost Parts Markup appropriates an equally identifiable fund: the markup payment on the difference between the actual price and the statutorily defined "wholesale value" of the part. That differential does not correspond to any cost incurred by the dealer. It is a compelled transfer of money for nothing, calculated on a statutorily ratcheted "wholesale value" that the dealer never paid and the Manufacturer never charged.

145. Each of these transfers is compelled by state law, not by any voluntary market relationship. The Act's obligations attach automatically upon a dealer's declaration or claim; refusal to pay exposes the Manufacturer to damages, injunctive relief, and mandatory fee awards, N.J.S.A. 56:10-10, including enforcement actions by NJ CAR, N.J.S.A. 56:10-34; and the NJFPA forecloses every means of avoiding the obligations. As alleged above, a Manufacturer may not restrict the nature or extent of the warranty work that its dealers perform, N.J.S.A. 56:10-15(b); may not perform that work itself or through others, N.J.S.A. 56:10-7.4(e), -27, -28; and may not terminate or exit the market. Payments made under this compulsion, under express reservation of rights, are not voluntary and effect no waiver of the Manufacturers' rights.

146. The compelled transfers are not for any public use. The funds do not go to the State, to any public program, or to any identifiable public purpose. They are deposited directly into the accounts of dealerships, with no obligation to reduce consumer prices, raise technician wages, improve service, or do anything in the public's interest.

147. The Labor Multiplier and Reduced-Cost Parts Markup accordingly effect *per se* takings of the Manufacturers' property on their faces. The Audit Limitation and Cost-Recovery Prohibition—together with the NJFPA's termination and exit provisions—confirm the appropriation's character. They strip away every mechanism by which the Manufacturers could contest, correct, offset, or recover the compelled

transfers, ensuring that the appropriation is complete and permanent in every application of the statute.

148. The Challenged Provisions also operate as an unconstitutional taking in the aggregate. Whatever might be said of any provision standing alone, their combined and mutually reinforcing operation—uncapped compensation unilaterally declared by dealers, payment for free and reduced-cost parts, sample-only audits, and a blanket recovery bar, all within a statutory structure that forecloses termination and exit—compels a continuing transfer of the Manufacturers' money to private parties that the Constitution does not permit.

149. In the alternative, the Challenged Provisions effect a regulatory taking under the factors identified in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). The economic impact is severe and quantifiable, costing hundreds of millions of dollars annually. The interference with investment-backed expectations is acute: for nearly 50 years the Manufacturers structured their franchise relationships, priced their warranties, and sold their vehicles against a statutory regime that bounded dealer compensation by retail prices and reasonableness, and the Act now reprices warranties already issued at prices that cannot be revisited. The character of the government action is the antithesis of an adjustment of the benefits and burdens of economic life to promote the common good: it is a direct transfer of money from one private party to another rather than for public use, at rates that the recipient unilaterally dictates, insulated from audit and recovery.

150. No compensation—just or otherwise—has been provided or is available for these takings. The Manufacturers are entitled to a declaration that the Challenged Provisions are facially invalid under the Takings Clause, to an injunction against their enforcement, and to a declaration that the payments that each Manufacturer has made under the Challenged Provisions were made under compulsion of law and under reservation of rights and effect no waiver of its right to recover them.

**COUNT III**
**(Commerce Clause of the U.S. Constitution, Art. I, § 8, cl. 3)**
**(By All Plaintiffs Against Both Defendants)**

151. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

152. The Commerce Clause denies the States the power to enact laws that discriminate against interstate commerce in purpose or practical effect, or that impose burdens on interstate commerce that are clearly excessive in relation to their putative local benefits. The Challenged Provisions transgress both limits.

153. ***Discriminatory purpose and design.*** The Act was conceived, promoted, designed, and enacted to benefit in-state dealers at the expense of the manufacturers. Its legislative sponsors described its purpose as ensuring that costs "fall[] on" the manufacturers—all of which New Jersey law bars from selling or servicing vehicles in the State directly, N.J.S.A. 56:10-7.4(e), -27, -28—and as "stand[ing] up for our local, small business owners." The Act's architecture matches those statements: every benefit runs to in-state dealers, and the Cost-Recovery Prohibition draws an express, facially discriminatory geographic line, forbidding

recovery of the Act's costs from any dealer "within this State" and thereby guaranteeing, by statutory design, that no New Jersey dealer bears any of the burden.

154. ***Discriminatory effect.*** In practical operation, the Challenged Provisions channel hundreds of millions of dollars annually from manufacturers to in-state dealers, while the Cost-Recovery Prohibition affirmatively forbids that burden from falling on New Jersey dealers. Those dealers thereby receive a state-conferred subsidy, funded by parties that the Act forbids from recovering the cost anywhere in New Jersey, that their direct competitors in the shared New York, Philadelphia, and Wilmington metropolitan service markets do not receive, advantaging New Jersey dealers. That asymmetry—benefits reserved to in-state actors, burdens forbidden from resting on any in-state beneficiary—is economic protectionism, not evenhanded regulation.

155. **Pike *balancing.*** In the alternative, the burden that the Challenged Provisions impose on interstate commerce is clearly excessive in relation to any putative local benefit. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The burden falls differentially on interstate commerce. The Compensation Provisions attach to vehicles sold, priced, and warranted in other States whenever those vehicles are later serviced in New Jersey, repricing completed out-of-state transactions to which New Jersey's only connection is where the owner later sought service. The Cost-Recovery Prohibition forbids any of the Act's costs from resting on the in-state dealers that it enriches. And the Act distorts competition between New Jersey dealers and their out-of-state neighbors. The result is a nine-figure annual extraction from interstate

commerce whose weight New Jersey has, by statute, declined to bear. The putative local benefit is illusory. Dealers were already guaranteed full retail-rate compensation under prior law, the Act requires none of its payments to reach technicians or consumers, and the State's asserted safety interests are not served by paying dealers above retail.

156. The Challenged Provisions are accordingly invalid under the Commerce Clause on their face, individually and in the aggregate, and the Manufacturers are entitled to a declaration that the Challenged Provisions are facially invalid under the Commerce Clause and an injunction against their enforcement.

**COUNT IV**
**(Due Process Clause of the Fourteenth Amendment to the U.S. Constitution)**
**(By All Plaintiffs Against Both Defendants)**

157. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

158. The Due Process Clause of the Fourteenth Amendment forbids the deprivation of property through legislation that bears no rational relationship to a legitimate government interest. The bare desire to enrich one private group at the expense of another is not a legitimate government interest, and legislation whose only function is such a transfer is not rational.

159. The Manufacturers have protected property interests in the funds the Challenged Provisions compel them to pay and in the contractual compensation methodologies that the Act overrides.

160. Each Challenged Provision is arbitrary and irrational on its own terms. The Labor Multiplier compels payment for repair time that no one worked, under a formula whose inputs the payee alone controls and whose declared outputs may exceed—without limit—what any retail customer pays for the same work. N.J.S.A. 56:10-15(m). The formula is also internally incoherent: it omits the Excluded Work from the sample and then compels payment for that same work at the labor rate, labor multiplier, and parts markup that the exclusion produced. The Reduced-Cost Parts Markup compels cash payments for goods calculated not based on the actual part price, but on the highest price that the part has ever carried. N.J.S.A. 56:10-15(e). The Parts-Pricing Restriction restricts manufacturers from lowering parts prices, even where the parts are used in customer-paid repairs and the cost savings could be passed on to retail customers. N.J.S.A. 56:10-15(q). The Audit Limitation defeats the only inquiry—comparison to actual retail charges—that could connect any of these payments to the retail-parity rationale offered for the Act. N.J.S.A. 56:10-15(a), (d), (l), (m). And the Cost-Recovery Prohibition serves no function except to insulate the resulting windfall from ordinary market correction. N.J.S.A. 56:10-15(o).

161. The irrationality is confirmed by the mismatch between the Act's stated purposes and its operation. If the legislature's purpose was retail-parity compensation, the Act is irrational. It repealed the retail-parity standard that existing law already guaranteed and prohibited the audits that would verify parity. If the purpose was enabling dealers to enforce their rights, the associational-standing grant accomplishes it without transferring a dollar. If the purpose was preserving a

network of dealers to perform warranty and recall service, the Act is irrational: dealers already performed that service, were already paid retail for it, and no finding suggests that any dealer would stop. If the purpose was correcting an inequality of bargaining power, the Act is irrational for eliminating bargaining rather than policing it. If the purpose was to increase technician wages, the Act is irrational for requiring no pass-through. And if the purpose was highway safety, the Challenged Provisions not only do not compel the repair of a single vehicle but also extend to maintenance plans, service contracts, and goodwill repairs that have nothing to do with safety recalls. There is no construction of the legislature's objectives on which compelling above-retail payments, insulated from audit and recovery, rationally advances them. Retroactivity compounds the problem: the Act reprices warranties issued before it existed, for which the Manufacturers can charge no one anything more.

162. Stripped of its rationales, the Act stands as naked economic favoritism. It is an integrated mechanism whose design and function is the transfer of wealth from one set of private parties to another at rates that the recipients unilaterally dictate, without regard to the value of any goods or services exchanged and insulated from every corrective that the market or the parties' contracts might supply. Compelling wealth transfers between private parties is not a legitimate exercise of the police power.

163. The Challenged Provisions accordingly violate the Due Process Clause of the Fourteenth Amendment on their face, individually and in the aggregate, and

the Manufacturers are entitled to a declaration that the Challenged Provisions are facially invalid under the Due Process Clause of the Fourteenth Amendment and an injunction against their enforcement.

**COUNT V**
**(Art. I, ¶ 1 of the New Jersey Constitution)**
**(By All Plaintiffs Against NJ CAR)**

164. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

165. Article I, Paragraph 1 of the New Jersey Constitution guarantees to "[a]ll persons . . . certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." The Challenged Provisions arbitrarily restrict the Manufacturers' rights, in violation of Article I, Paragraph 1.

166. The Manufacturers, like all private actors, have a substantial private interest in the right to negotiate and enter into arm's-length contracts freely. That freedom existed at common law and is central to the rights of acquiring, possessing, and protecting property that Article I, Paragraph 1 protects.

167. Each Manufacturer's written dealer agreements with its New Jersey dealers, together with the policies and procedures they incorporate, expressly govern the methodology for determining warranty and recall compensation for labor and parts. The Challenged Provisions arbitrarily and retroactively override that bargain, writing into the franchise relationship terms that the Manufacturers never accepted.

168. Each Challenged Provision adds an extra-contractual obligation to that bargain. The Dealer-Declared Rate Provisions impose unilaterally declared labor rates, labor multipliers, and parts markups found nowhere in the dealer agreements, and the Audit Limitation places those declarations beyond any audit or adjustment based on market information. The Reduced-Cost Parts Markup compels a markup on a "wholesale value" that the Manufacturers never agreed to, for parts they supplied at no or reduced cost. The Parts-Pricing Restriction overrides the Manufacturers' contractual right to set their own parts prices. And the Cost-Recovery Prohibition forecloses the adjustments within the franchise relationship by which the Manufacturers might otherwise recoup those costs. Individually and in the aggregate, the Challenged Provisions substantially interfere with the Manufacturers' rights.

169. No public need justifies the restrictions that the Challenged Provisions impose. As alleged in Paragraph 161, every purpose offered for the Act is unsupported—if not contradicted—by its own terms. The Challenged Provisions are also unreasonable, arbitrary, and capricious and bear no real and substantial relation to any legitimate object the legislature identified.

170. The Challenged Provisions accordingly violate Article I, Paragraph 1 of the New Jersey Constitution on their face, individually and in the aggregate, and the Manufacturers are entitled to a declaration that the Challenged Provisions are facially invalid under Article I, Paragraph 1 of the New Jersey Constitution and an injunction against their enforcement.

**COUNT VI**
**(Federal Preemption — National Traffic and Motor Vehicle Safety Act; U.S. Const. Art. VI, cl. 2)**
**(By All Plaintiffs Against Both Defendants)**

171. Plaintiffs incorporate by reference Paragraphs 1 through 132 as if fully set forth herein.

172. Under the Supremacy Clause, state law is preempted when it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. This Court's equitable authority extends to enjoining enforcement of preempted state statutes, including enforcement by NJ CAR, which the legislature has statutorily authorized to enforce the NJFPA. N.J.S.A. 56:10-34.

173. The Dealer-Declared Rate Provisions obstruct the Safety Act's federally established scheme for the administration of recalls. Federal law measures dealer recall compensation by fairness. *See* 49 U.S.C. § 30120(f)(1). Prior New Jersey law was consistent with that measure: it bounded dealer compensation by a reasonableness check and preserved robust manufacturer audit rights. The Act deleted both. In their place, it prescribes dealer compensation for labor and parts used in recall remedies through dealer-declared labor rates, labor multipliers, and parts markups. And the Audit Limitation and Cost-Recovery Prohibition ensure that the Manufacturers cannot restore the fair-reimbursement measure that the Safety Act demands.

174. The Reduced-Cost Parts Markup also obstructs the federal scheme. It seizes on the manufacturer's federally mandated supply of free recall parts for unsold new inventory and deems it a commercial sale, assigning the part a statutorily

ratcheted "wholesale value" that the dealer never paid and compelling the manufacturer to pay a markup on that fictitious price. No State has authority to reconstruct the commercial terms on which a manufacturer discharges its federal recall obligations, to convert federally required remediation into a dealer profit center, or to tax—for private benefit—the very act of compliance with federal safety law.

175. The Parts-Pricing Restriction compounds the obstruction by reaching into the federal recall-initiation process itself. It constrains manufacturer parts-pricing decisions "within 60 or fewer days preceding an announcement of a recall"—the very period in which a NHTSA defect investigation is typically pending and remedy logistics are being fixed—and prohibits ordinary parts-management measures, such as new part numbers and kit pricing, whenever dealer compensation would be affected. Read together with the Reduced-Cost Parts Markup's highest-historical-price floor, these provisions ensure that every market response available to a manufacturer managing a federal recall is either forbidden or ratchets its costs upward.

176. The Dealer-Declared Rate Provisions, N.J.S.A. 56:10-15(d), (l), (m); the Reduced-Cost Parts Markup, N.J.S.A. 56:10-15(e); and the Parts-Pricing Restriction, N.J.S.A. 56:10-15(q), as applied to federally mandated recall remedies, are accordingly preempted and facially invalid under the Supremacy Clause. The Manufacturers are entitled to a declaration to that effect and to an injunction restraining both Defendants from enforcing those provisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and:

A. Declare that Section 7 of the Act—codified in the amendments to N.J.S.A. 56:10-15, including the introductory clause of N.J.S.A. 56:10-15 and N.J.S.A. 56:10-15(a), (d), (e), (j), (l), (m), (n), (o), (p), and (q)—is unconstitutional and invalid on its face, individually, in the aggregate, and as an integrated and non-severable scheme, under the Contracts Clause, the Takings Clause, the Commerce Clause, and the Due Process Clause of the United States Constitution, and Article I, Paragraph 1 of the New Jersey Constitution, and that upon its invalidation the provisions of former N.J.S.A. 56:10-15 continue to govern;

B. Declare that the Dealer-Declared Rate Provisions, N.J.S.A. 56:10-15(d), (l), (m); the Reduced-Cost Parts Markup, N.J.S.A. 56:10-15(e); and the Parts-Pricing Restriction, N.J.S.A. 56:10-15(q), as applied to federally mandated recall remedies, are preempted by the National Traffic and Motor Vehicle Safety Act and invalid under the Supremacy Clause;

C. Permanently enjoin the Attorney General and NJ CAR, together with their respective officers, agents, employees, members, successors, and all persons acting in concert with them, from enforcing the Challenged Provisions against Plaintiffs;

D. Declare that the payments each Plaintiff has made under the Challenged Provisions were made under compulsion of law and under reservation of rights and effect no waiver of its right to recover them;

E. Award Plaintiffs their costs and reasonable attorneys' fees against the Attorney General under 42 U.S.C. § 1988 and against Defendants under any other applicable authority; and

F. Grant such other and further relief as the Court deems just and proper.

Dated: November 20, 2026.

Respectfully submitted,

By: *s/ Gregory D. Miller*

Owen H. Smith (to be admitted PHV)
Matthew A. Bills (to be admitted PHV)
Zoe Cross (to be admitted PHV)
**BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP**
200 West Madison Street, Suite 3900
Chicago, Illinois 60606
Telephone: 312-984-3100
Facsimile: 312-984-3150
Owen.Smith@bfkn.com
Matthew.Bills@bfkn.com
Zoe.Cross@bfkn.com

Michael W. McConnell (to be admitted PHV)
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 94304
Telephone: 650-493-9300
MMcConnell@wsgr.com

Steffen N. Johnson (to be admitted PHV)
**WILSON SONSINI GOODRICH & ROSATI**
1700 K Street, N.W.
Washington, DC 20006
Telephone: 202-973-8800
SJohnson@wsgr.com

Gregory D. Miller
Timothy P. Gonzalez

**RIVKIN RADLER LLP**
25 Main Street
Court Plaza North, Suite 501
Hackensack, NJ 07601-7082
Telephone: 201-287-2460
Facsimile: 201-489-0495
Gregory.Miller@rivkin.com
Timothy.Gonzalez@rivkin.com

*Attorneys for Plaintiffs Ford Motor Company, FCA US LLC, American Honda Motor Co., Inc. and Volkswagen Group of America, Inc.*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the matter in controversy in this action is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 20, 2026.

*s/ Gregory D. Miller*
Gregory D. Miller

**LOCAL CIVIL RULE 201.1 CERTIFICATION**

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the plaintiffs seek, inter alia, injunctive and declaratory relief in their respective pleadings.

I hereby certify under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2026.

*s/ Gregory D. Miller*
Gregory D. Miller